# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| DAMON HENRY, | ) | CASE NO.  1:19-cv-01546-SL |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | |
| UNIVERSITY HOSPITALS | ) | |
| CLEVELAND MEDICAL CENTER, *et* | ) | |
| *al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

---

## <u>STATEMENT OF ADHERENCE TO LR 7.1</u>

This Memorandum in Support adheres to the page limitations set forth in Local Rule 7.1 of the United States District Court for the Northern District of Ohio.  The present action has been assigned to the standard case management track.

## TABLE OF CONTENTS

STATEMENT OF ADHERENCE TO LR 7.1 ...................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... v

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF FACTS .................................................................................. 1

      A.      As A Division Secretary, Plaintiff's Job Responsibilities Were Vital To
Ensuring Proper Patient Care And Safety ................................................... 1

      B.      Plaintiff Sought A Transfer After Demonstrating Poor Performance Of His
Job Duties At Lerner. ..................................................................................... 2

      C.      Plaintiff's Performance And Attendance Deficiencies Continued At
Seidman .......................................................................................................... 3

      D.      Plaintiff's Employment Is Terminated Due To Egregious Behavior
Toward A Patient And Excessive Absenteeism ........................................... 5

      E.      Plaintiff's Termination Is Reviewed And Upheld In A Two-Step
Complaint Resolution Process. ..................................................................... 6

III.    LAW AND ARGUMENT .................................................................................... 7

      A.      Defendants Are Entitled To Summary Judgment As A Matter Of Law ................ 7

      B.      Plaintiff's FMLA Claims (Counts I and II) .................................................. 7

            1.      Plaintiff's FMLA Interference Claim Fails ........................................ 7

            2.      Plaintiff's FMLA Retaliation Claim Also Fails As A Matter Of
Law. .............................................................................................. 9

      C.      Plaintiff's Gender and Disability Discrimination Claims (Counts III, IV,
VII and VIII) ............................................................................................... 11

            1.      Plaintiff Has No Direct Evidence Of Gender or Disability
Discrimination ............................................................................. 11

            2.      Plaintiff Cannot Establish Indirect Evidence Of Gender or
Disability Discrimination ............................................................ 11

            3.      Plaintiff Cannot Establish A *Prima Facie* Case Of Gender
Discrimination ............................................................................. 12

            4.      Plaintiff Cannot Establish A *Prima Facie* Case Of Disability
Discrimination ............................................................................. 14

5.      Plaintiff Cannot Establish That Defendants' Legitimate, Nondiscriminatory Reasons For His Discharge Are A Pretext For Unlawful Discrimination. ........................................................................ 15

D.      Plaintiff's Retaliation Claims (Counts V and VI)................................................. 19

1.      Plaintiff Cannot Establish A *Prima Facie* Case Of Retaliation................ 19

2.      Defendants Have Legitimate, Non-Retaliatory Reasons For Plaintiff's Termination Which Are Not A Pretext For Retaliation........... 20

V.      **CONCLUSION ........................................................................................................20**

# **TABLE OF AUTHORITIES**

**Cases**

*Allen v. Ohio Dept. of Job & Family Servs.*, 697 F.Supp.2d 854, 880 (S.D. Ohio 2010) ...... 11, 17

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................. 7

*Arban v. West Publishing Corp.*, 345 F.3d 390, 4040 (6th Cir. 2003) .......................................... 9

*Barnett v. Dept. of Veterans Affairs*, 153 F.3d 338, 342-43 (6th Cir. 1998), *cert. denied,*
525 U.S. 1106 (1999)......................................................................................................... 18

*Barrow v. City of Cleveland*, 773 Fed.Appx. 254, 261 (6th Cir. 2019)........................................ 19

*Beamon v. Marshall & Ilsley Trust Co.,* 411 F.3d 854, 863 (7th Cir. 2005)................................. 17

*Bush v. Am. Honda Motor Co., Inc.*, 227 F.Supp.2d 780, 797 (S.D. Ohio 2002)........................ 10

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ..................................................................... 7

*Columbus Civ. Serv. Comm. v. McGlone,* 82 Ohio St.3d 569, 573 (1998)................................... 11

*Crawford v. JP Morgan Chase & Co.*, 531 Fed.Appx. 622, 625 (6th Cir. 2013).......................... 8

*DeBolt v. Eastman Kodak Co.* (10 Dist.), 2001-Ohio-3996 ........................................................ 14

*DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004) ................................................................. 11

*Hartsel v. Keys*, 87 F.3d 795, 801-02 (6th Cir. 1996), *cert. denied,* 519 U.S. 1055 (1997).......... 17

*Holden v. Atos Tech. Solution*, Case No. 1:14-cv-914, 2016 U.S. Dist. LEXIS 76560
(S.D. Ohio Apr. 12, 2016)................................................................................................. 12

*House v. Kirtland Capital Partners,* 158 Ohio App.3d 68, 2004-Ohio-3688 ............................. 14

*Humenny v. Genex Corp., Inc.*, 390 F.3d 901, 905-906 (6th Cir. 2004) ...................................... 10

*Kelly v. First Data Corp.*, Case No. 1:19-cv-372, 2020 U.S. Dist. LEXIS 13239 (S.D.
Ohio Jan. 27, 2020)............................................................................................................ 9

*Kocsis v. Multi-Care Mgmt. Inc.,* 97 F.3d 876, 884 (6th Cir. 1996)............................................ 14

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)................................. 12, 15, 19

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)...................................................... 13

*Myers,* 2007-Ohio-3228 .............................................................................................................. 14

*Newman v. Fed. Express Corp.*, 266 F.3d 401, 405 (6th Cir. 2001), *quoting, Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ...................................................................... 18

*Roghelia v. Hopedale Mining, LLC*, 2014-Ohio-2934, at *6-7 (7th Dist., June 23, 2014) .......... 14

*Sami v. Detroit Med. Ctr.*, 591 Fed.Appx. 419, 426 (6th Cir. 2014) ............................................ 20

*Schmittou v. Wal-Mart Stores, Inc.*, 2003 U.S. Dist. LEXIS 15767, *7 (D. Minn. Aug. 22, 2003) .......................................................................................................................................... 10

*Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 282 (6th Cir. 2012)........................................... 7

*Sizemore v. Edgewood Bd. of Educ.*, Case No. 1:19-cv-555, 2020 U.S. Dist. LEXIS 67765 (S.D. Ohio Apr. 17, 2020)...................................................................................... 19

*Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998).................................................... 17

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) ........................ 12, 16

*Thaman v. OhioHealthCorp.*, 2005 U.S. LEXIS 12872 (S.D. Ohio, June 29, 2005)................... 19

*Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 195 (2002) ................................. 15

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)................................................ 19

*Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 572 (6th Cir. 2003) ................................. 16

*Whitworth v. Consol. Biscuit Co.*, 2007 U.S. Dist. LEXIS 25971, at *10 (E.D. Ky. Apr. 6, 2007) .......................................................................................................................................... 10

*Zambetti v. Cuyahoga Comm. College*, 314 F.3d 249, 258 (6th Cir. 2002) ................................. 16

**Statutes**

29 C.F.R. §825.113(b) ...................................................................................................................... 8

29 C.F.R. §825.114 ........................................................................................................................... 8

29 C.F.R. §825.115(a) ...................................................................................................................... 9

29 U.S.C. §2611(11) ......................................................................................................................... 8

29 U.S.C. §2612(a)(1)(D) ................................................................................................................. 8

R.C. §4112.02 ................................................................................................................................. 14

**Rules**

Federal Rule of Civil Procedure 56(a) .............................................................................................. 7

## I.    __INTRODUCTION__

Plaintiff[1] worked for UH for less than 18 months.  He was a Division Secretary at two different units, responsible for relaying important patient information to nursing staff members. He failed miserably at performing his job duties.  At his first unit, nursing staff repeatedly complained that Plaintiff was often away from his desk, was rude, and failed to communicate patient information.  Therefore, Plaintiff requested a transfer.  Despite a fresh start at a new unit, Plaintiff's poor performance continued.  In less than 5 months, the Nursing Manager received 16 staff complaints regarding Plaintiff's poor performance.  Finally, Plaintiff's employment was terminated on March 4, 2019 because (1) a patient who had been intubated complained that Plaintiff hung up on him twice when he tried to call for assistance, and Plaintiff did not send anyone to help him; and (2) Plaintiff incurred his 11th unscheduled absence within a 12-month period, in violation of UH's Attendance policy.

## II.    __STATEMENT OF FACTS__

### A.    __As A Division Secretary, Plaintiff's Job Responsibilities Were Vital To Ensuring Proper Patient Care And Safety.__

Plaintiff was hired by UH on November 27, 2017 as a Division Secretary at Lerner Tower 4 ("Lerner").  Plaintiff worked at the main desk on the unit floor and was expected to answer call lights when patients needed assistance, obtain and prepare patient charts, wristbands and discharges, and notify the nursing staff of new admissions and transfers. (Deposition of Plaintiff Damon Henry, pp. 58-59)[2]  While Plaintiff did not provide direct

---

[1] In the Complaint, Plaintiff identifies as a transgender female.  However, during Plaintiff's employment, Plaintiff never disclosed to anyone that he identified as transgender (Pl. Dep. pp. 82-83) and asked employees and managers to call him "Henry." (Pl. Dep. p. 9)  Since no one was aware of Plaintiff's preferred gender identity, all employment documentation refers to Plaintiff using masculine pronouns.  Therefore, for purposes of this Motion only, Defendants will refer to Plaintiff using masculine pronouns.  This is solely to avoid confusion in referencing various exhibits and deposition testimony, and is not meant to disrespect Plaintiff.

[2] The deposition of Damon Lee Henry was taken on August 19, 2020.  Relevant portions of the deposition transcript and exhibits will be cited herein as (Pl. Dep. p. __) and are attached hereto as Appendix A.

patient care (other than occasionally retrieving a requested item such as a blanket or cup of water, Pl. Dep. p. 61), his role was instrumental in ensuring that patients received important care by promptly relaying patient needs to the nursing staff. (Pl. Dep. pp. 61-62) A Division Secretary's failure to relay patient needs to the nursing staff results not only in substandard patient care, but also the possibility of serious safety risks to the patient. (*Id.*)

B.  **Plaintiff Sought A Transfer After Demonstrating Poor Performance Of His Job Duties At Lerner.**

Plaintiff immediately demonstrated poor communication skills in his role as Division Secretary at Lerner.  This resulted in his supervisor extending his 90-day introductory period for an additional two weeks. (Pl. Dep. p. 40, Ex. D)  Even after an extended introductory period, Plaintiff admits that he received continued criticism regarding his job performance. (Pl. Dep. pp. 37-38)  The following concerns are examples of multiple issues raised by employees and documented to Plaintiff:

- RN Jennifer K. reported that Plaintiff had a negative attitude and was often missing from the secretary's desk;
- Karen H. reported that Plaintiff turned down the phone volume so he could not hear phone calls;
- Warren M. reported that Plaintiff failed to give him shift reports;
- Christian M. reported that Plaintiff was rude and sarcastic toward an employee who accidentally hit the patient call button;
- Hannah F. reported that Plaintiff never notified her of a patient arrival;
- Melissa B. reported that Plaintiff failed to transfer her patient for more than an hour.

(Declaration of Karen Hess, ¶5, Att. 1, attached hereto as Appendix B)  In response to these legitimate performance concerns, Plaintiff simply argued he was "being targeted" and did not take ownership of his deficiencies. (*Id.*)  Plaintiff also incurred multiple unscheduled absences at Lerner. (Hess Decl. ¶6)

Unhappy with being held accountable for his poor performance, Plaintiff contacted Human Resources and asked if he could transfer to a different position. (Pl. Dep. p. 46)

Plaintiff was permitted to seek a transfer, even though he had not been in his position for at least 12 months, as required by UH policy.  (Pl. Dep. p. 47; Declaration of Karen Hess, at ¶2, attached as Exhibit B)  Nonetheless, Plaintiff's transfer would not erase his attendance or performance counselings at Lerner. (Hess Decl. ¶3)  Upon a transfer, an employee's prior attendance points and disciplinary actions continue to be in effect. (*Id.*)

Human Resources identified that a Division Secretary position was available at the Seidman Cancer Center at Division 4 ("Seidman").  Seidman Nurse Manager Karen Hess agreed to interview Plaintiff for the position. (Hess Decl. ¶4; Pl. Dep. pp. 57-58) Following the interview, Ms. Hess offered Plaintiff the position. (*Id.*, p. 58)  Plaintiff accepted and transferred to Seidman on October 28, 2018. (*Id.*, p. 45)  Despite the fact that the Seidman position was essentially the same as Plaintiff's position at Lerner (Pl. Dep. p. 62), Ms. Hess gave Plaintiff an additional two (2) weeks of orientation upon his transfer in an attempt to improve his skills. (Hess Decl. ¶5)  Ms. Hess wanted to give Plaintiff a fresh start and every ability to succeed in his new position. (*Id.*)

### C.  Plaintiff's Performance And Attendance Deficiencies Continued At Seidman.

When he transferred to Seidman, Plaintiff already had incurred seven unscheduled absences. (Hess Decl. ¶6)  Under UH's Attendance policy, any employee who accumulates six (6) unscheduled absences within any consecutive 12 month period is subject to progressive corrective action. (*Id.*, at ¶6, Att. 2)  Each occurrence after the first six (6) absences will progress the level of action taken, up to termination. (*Id.*)

Soon after transferring to Seidman, Plaintiff racked up more unscheduled absences. On November 9, 2018, Ms. Hess issued a Confirmation of Counseling to Plaintiff for his 8th unscheduled absence within a 12-month period. (Pl. Dep. p. 111, Ex. E)  On November

23, 2019, Plaintiff failed to show up for work the day after Thanksgiving, so he progressed to a Warning. (*Id.*, p. 117, Ex. H)  Shortly thereafter, Plaintiff failed to show up for work on New Year's Day.  Therefore, he received a Final Warning for his 10th unscheduled absence. (*Id.*, p. 120, Ex. J)  By receiving the Final Warning, Plaintiff was on notice under UH's Attendance policy that any further violation resulting in corrective action could subject his to termination. (Hess Decl. ¶7, Att. 3)

In addition to his poor attendance, Plaintiff's poor performance continued.  Similar to his short tenure at Lerner, multiple employees reported significant concerns with Plaintiff's failure to perform his job duties.  For example, the following staff members raised legitimate concerns regarding Plaintiff:

- Charge Nurse Emily M. complained that Plaintiff was frequently away from the secretary's desk and took excessive breaks. (Pl. Dep. pp. 63-64, 113, Ex. F)
- Nurse Elizabeth W. complained that Plaintiff failed to communicate patient needs to the staff and often failed to communicate to nurses that new patients arrived on the floor. (*Id.*, pp. 66-67, 70)
- Elizabeth H. complained that Plaintiff failed to submit a work order requested by a patient. (Pl. Dep. pp. 68, 132, Ex. O)
- Charge Nurse Kathleen B. complained that Plaintiff failed to provide important information to the nursing staff, which resulted in staffing difficulties. (Pl. Dep. p. 107)
- Toni B. complained that Plaintiff called her excessively on Vocera. (*Id.*, p. 109)
- Several nurses criticized Plaintiff's failure to prepare patient identification bands and stickers. (Pl. Dep. pp. 75-77, 130-31, Ex. N)

In less than five months in his position, Ms. Hess received *16 separate complaints* about Plaintiff's performance. (Hess Decl. ¶8, Att. 4)  Ms. Hess spent an inordinate amount of time addressing Plaintiff's performance deficiencies, meeting with him on 12 separate occasions to counsel him toward improvement. (Hess Decl. ¶9, Att. 5)

**D.**    **Plaintiff's Employment Is Terminated Due To Egregious Behavior Toward A Patient And Excessive Absenteeism.**

On February 19, 2019, a Seidman cancer patient who had been intubated, with a very hoarse and raspy voice, pressed the call light for assistance.  (Pl. Dep. p. 124, Ex. L)  The call light went to the Division Secretary's desk and Plaintiff answered the call. (*Id.*)  The patient attempted to communicate with Plaintiff, but Plaintiff had trouble hearing the patient.  Therefore, Plaintiff said "I can't hear you" and hung up the phone. (*Id.*)  The patient called again to try to communicate with Plaintiff.  Plaintiff again responded, "I can't hear you" and hung up on the patient. (*Id.*)  Plaintiff took no action to follow up with the patient to determine what he needed.  (*Id.*)

The patient informed the hospital chaplain, who notified Ms. Hess, of Plaintiff's egregious behavior.  Upon receiving the complaint, Ms. Hess interviewed the patient, who confirmed that Plaintiff was extremely rude, hung up on him twice, and no one responded to help him. (Hess Decl. ¶14, Att. 8)  When Ms. Hess met with Plaintiff to discuss the incident, he denied the complaint and stated he did not recall the incident. (Pl. Dep. p. 124-125, Ex. L)  Ms. Hess was extremely disturbed by the complaint, and noted that a similar patient complaint was made against Plaintiff just several months earlier in December 2018, where the patient alleged that Plaintiff was rude and hung up on him. (*Id.*)  Plaintiff also denied that incident occurred. (*Id.*)

In addition, on February 20, 2019 (one day after Plaintiff's egregious behavior toward the patient), Plaintiff incurred his 11th unauthorized absence under UH's Attendance policy. (Pl. Dep. p. 124, Ex. L)  Plaintiff was involved in a minor car accident on his way to work, so he arrived late for his scheduled shift. (Pl. Dep. pp. 139-140)  Shortly after his late arrival, Plaintiff left early to go to the Emergency Department ("ED") to "get checked out." (*Id.*, p. 138)  Plaintiff was at the ED for less than two hours before being discharged. (*Id.*)  Because Plaintiff

did not work more than 75% of his shift due to his late arrival and early departure, Plaintiff's absence counted as an unscheduled absence under the Attendance policy. (Hess Decl. ¶6, Att. 2)

Under UH's Corrective Action policy, managers must consider the following when determining appropriate disciplinary action: (1) previous corrective actions including attendance, tardiness, and/or job performance; (2) the amount of time since the last violation; and (3) the seriousness of the violation. (Hess Decl. ¶7, Att. 3)  Based on the egregiousness of the patient's complaint (which was similar to a prior patient complaint), the number of other performance concerns repeatedly addressed with Plaintiff, and his 11th unscheduled absence less than two months after receiving a Final Warning, Ms. Hess determined that Plaintiff's employment should be terminated. (*Id.*, ¶16)  Ms. Hess' decision was supported by Human Resources. (*Id.*)  Therefore, Plaintiff was discharged on March 5, 2019. (Pl. Dep. p. 133, Ex. P)

### E.  Plaintiff's Termination Is Reviewed And Upheld In A Two-Step Complaint Resolution Process.

All UH employees are afforded the opportunity to "appeal" a termination decision under UH's Complaint Resolution Policy by seeking an independent review of the termination decision. (Hess Decl. ¶17, Att. 11)  In Step 1, Plaintiff submitted a complaint resolution form and a supplemental statement, alleging that his employment was terminated because of sexual orientation, race and gender discrimination; in retaliation for his complaints about various employees; and in violation of the FMLA. (Pl. Dep. pp. 145-46, Ex. Q and R)  Operations VP Linda Mangosh conducted the Step 1 review process – meeting with Plaintiff to discuss his allegations, reviewing the relevant documentation and policies, and meeting with Ms. Hess. (Pl. Dep. p. 147, Ex. S)  After reviewing all of the evidence, Ms. Mangosh upheld the termination decision, finding that Plaintiff failed to follow up on the patient's request for assistance and Ms. Hess consistently followed UH's Attendance policy. (*Id.*)

Dissatisfied with Ms. Mangosh's decision, Plaintiff proceeded to Step 2 of the Complaint Resolution process.  In Step 2, a Peer Resolution Committee ("PRC") consisting of a panel of Plaintiff's peers conducted an independent review of the termination decision. (Hess Decl. ¶17, Att. 11)  The PRC met with Plaintiff to discuss his allegations in detail, and also reviewed all of the relevant documentation and UH policies.  After reviewing all of the evidence, the PRC also upheld the termination decision, finding Plaintiff failed to take action to follow up on the patient's concerns, and his lack of action was a risk to patient care. (Pl. Dep. p. 147, Ex. T)

## III.    LAW AND ARGUMENT

### A.    Defendants Are Entitled To Summary Judgment As A Matter Of Law.

Federal Rule of Civil Procedure 56(a) provides that the court shall grant summary judgment to a movant if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The burden is on the moving party to show no genuine dispute of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### B.    Plaintiff's FMLA Claims (Counts I and II)

A plaintiff can assert a Family and Medical Leave Act ("FMLA") claim under two distinct theories:  (1) an action for "interference" with FMLA rights; and/or (2) an action for "retaliation" against employees who exercise FMLA rights.  *Seeger v. Cincinnati Bell Tel. Co.,* 681 F.3d 274, 282 (6th Cir. 2012).  Plaintiff's Complaint asserts both theories, claiming he was terminated for exercising his "right" to take FMLA leave on February 20, 2019.

#### 1.    Plaintiff's FMLA Interference Claim Fails.

Count I of the Complaint alleges a claim for FMLA interference. (Compl. ¶¶128-139)  To establish his interference claim, Plaintiff must show that (1) he is an "eligible employee" under

the FMLA; (2) UH is an "employer"; (3) Plaintiff was entitled to FMLA leave; (4) Plaintiff gave UH notice of his intention to take FMLA leave; and (5) UH denied Plaintiff the FMLA benefits to which he was entitled.  *Crawford v. JP Morgan Chase & Co.,* 531 Fed.Appx. 622, 625 (6th Cir. 2013).

Plaintiff's FMLA interference claim fails because his February 20, 2019 absence was not FMLA-qualifying.  That day, Plaintiff arrived late for his shift because he was involved in a minor car accident. (Pl. Dep. p. 139-140)  Shortly after Plaintiff's late arrival, he left early to get "checked out" at the ED – not to seek treatment for a particular condition.  (*Id.*, p. 138)  Plaintiff was at the ED *less than two hours* before being released that same day, without restrictions or prescriptions. (*Id.*)  Plaintiff testified he could have returned to work the same day to finish his shift, but UH already found someone to cover for him. (Pl. Dep. p. 142)  Ultimately, Plaintiff's employment was terminated, in part, because of his February 20, 2019 absence.

Plaintiff's partial absence on February 20, 2019 did not qualify for FMLA leave.  The FMLA provides eligible employees with up to 12 weeks of leave per year for "a serious health condition that makes the employee unable to perform the functions of the position of such employee."  *See* 29 U.S.C. §2612(a)(1)(D).  Under 29 U.S.C. §2611(11), a "serious health condition" is defined as an illness, injury, impairment or physical or mental condition that involves: (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider.  "Inpatient care" is defined as "an overnight stay in a hospital, hospice, or residential medical facility, including any period of incapacity as defined by 29 C.F.R. §825.113(b), or any subsequent treatment in connection with such inpatient care." *See* 29 C.F.R. §825.114.  As Plaintiff testified, he was not admitted to the hospital for an overnight stay – he visited the ED for less than 2 hours. (Pl. Dep. pp. 138)

Further, Plaintiff experienced no period of incapacity as a result of any "condition" caused by the car accident.  Absent an overnight stay at the hospital, Plaintiff must show that he was incapacitated for a period of *at least three days* in addition to follow-up treatment by a health care provider.  *See* 29 C.F.R. §825.115(a).  After less than two hours at the ED, Plaintiff left with no restrictions or medications, and was physically able to return to work.  (Pl. Dep. p. 138)  Plaintiff had no period of incapacity.  Therefore, Plaintiff's interference claim fails because he cannot establish that he was qualified for, or denied, FMLA benefits due to his February 20, 2019 absence.  *See, e.g., Kelly v. First Data Corp.*, Case No. 1:19-cv-372, 2020 U.S. Dist. LEXIS 13239 (S.D. Ohio Jan. 27, 2020) (denying plaintiff's FMLA interference claim based on Plaintiff's ER visit for her heart "racing"; Plaintiff was not admitted overnight and was not incapacitated for more than 3 consecutive days or diagnosed with a serious health condition; plaintiff did not miss even a single full day due to the incident).

### 2. Plaintiff's FMLA Retaliation Claim Also Fails As A Matter Of Law.

In Count II of the Complaint, Plaintiff alleges FMLA retaliation, claiming Defendants discharged him in retaliation for his FMLA-qualifying absence on February 20, 2019 and for other "meritless" disciplinary actions. (Compl. ¶¶140-149)  To establish an FMLA retaliation claim, Plaintiff must show that: (1) he availed himself of a protected right under the FMLA; (2) UH knew of Plaintiff's exercise of a protected right; (3) Plaintiff was subjected to an adverse employment action; and (4) there was a causal connection between the exercise of the protected right and the adverse employment action. *Arban v. West Publishing Corp.*, 345 F.3d 390, 4040 (6th Cir. 2003).

As set forth in Section III.B.1 above, Plaintiff's February 20, 2019 absence was not FMLA-qualifying.  If a plaintiff is ineligible for FMLA, he does not engage in statutorily

protected activity by attempting to exercise a "right" he does not have.  *See Humenny v. Genex Corp., Inc.*, 390 F.3d 901, 905-906 (6th Cir. 2004) (holding plaintiff's FMLA retaliation claim failed because he was not eligible for FMLA leave, therefore he did not exercise or attempt to exercise a "right" provided by the FMLA, even if he held a "good faith" belief that he was qualified).[3]  Therefore, Plaintiff cannot establish that he availed himself of a protected "right" under the FMLA.

Further, Plaintiff cannot establish FMLA retaliation based on his allegation that he received "meritless disciplinary action(s)." (Compl. ¶147)  Other than the timing of his discharge, Plaintiff testified he has no facts establishing FMLA retaliation. (Pl. Dep. pp. 158-59)  Since Plaintiff's February 20, 2019 absence was not FMLA-qualifying, it counted as Plaintiff's 11th unscheduled absence under UH's Attendance policy. (Hess Decl. ¶6, Att. 2)  Therefore, Defendants followed UH's Attendance and Corrective Action policies by terminating Plaintiff's employment (in part) for attendance. (*Id.*, ¶¶6-7, Att. 2-3)

However, Plaintiff's employment *also* was terminated because of a verified patient complaint that Plaintiff hung up on a patient twice when he called for help, and did not send anyone to the patient's room to check on him.  (Hess Decl. ¶14, Att. 8; Pl. Dep. p. 133, Ex. P) Following his termination, Operations VP Linda Mangosh and an independent Peer Resolution Committee reviewed the decision, including FMLA issues.  Both determined that Plaintiff's termination was justified and was not in violation of the FMLA.  *See e.g. Bush v. Am. Honda Motor Co., Inc.*, 227 F.Supp.2d 780, 797 (S.D. Ohio 2002) (it is well-settled that courts "do not

---

[3] *See, also, Schmittou v. Wal-Mart Stores, Inc.*, 2003 U.S. Dist. LEXIS 15767, *7 (D. Minn. Aug. 22, 2003) (holding plaintiff's retaliation claim failed where daughter's condition was not a 'serious health condition' that would give rise to FMLA rights and benefits for the mother, therefore "it was impossible for him to engage in any activity protected by the statute."); *Whitworth v. Consol. Biscuit Co.*, 2007 U.S. Dist. LEXIS 25971, at *10 (E.D. Ky. Apr. 6, 2007) (holding FMLA retaliation and interference claims failed where plaintiff could not survive 'threshold consideration' of showing that he suffered a serious health condition entitling him to FMLA leave).

sit as super personnel departments to second guess an employer's facially legitimate business decisions"). Therefore, Plaintiff's FMLA retaliation claim fails.

**C.**    **Plaintiff's Gender and Disability Discrimination Claims (Counts III, IV, VII and VIII)**

In Counts III and IV of the Complaint, Plaintiff pleads claims for gender discrimination under R.C. Chapter 4112 and Title VII. In Counts VII and VIII, Plaintiff alleges disability discrimination under R.C. Chapter 4112 and the ADA.  In analyzing employment discrimination claims brought under Ohio Revised Code Chapter 4112, courts use the same analytical framework applied to claims under Title VII and the ADA.  *See Allen v. Ohio Dept. of Job & Family Servs.*, 697 F.Supp.2d 854, 880 (S.D. Ohio 2010) (Title VII); *Columbus Civ. Serv. Comm. v. McGlone,* 82 Ohio St.3d 569, 573 (1998) (ADA).  Since all of Plaintiff's federal and state discrimination claims require a similar analysis, Defendants will address them together.

**1.**    **Plaintiff Has No Direct Evidence Of Gender or Disability Discrimination.**

At the summary judgment stage, Plaintiff must produce either direct or circumstantial evidence to prevail on his discrimination claims.  *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).  Plaintiff has no direct evidence of discrimination.  Plaintiff testified that Ms. Hess never said anything derogatory about his gender or called him names, and Defendants never demonstrated a bias against transgendered individuals. (Pl. Dep. pp. 94-95, 163-64, 171) Similarly, Defendants never made negative comments regarding Plaintiff's alleged disability or showed bias against disabled individuals. (*Id.,* pp. 169-171) Therefore, Plaintiff must rely upon indirect evidence to prove his claims.

**2.**    **Plaintiff Cannot Establish Indirect Evidence Of Gender or Disability Discrimination.**

Under the *McDonnell Douglas* burden-shifting analysis, Plaintiff bears the burden of first

establishing a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  If Plaintiff can establish a *prima facie* case, the burden of production then shifts to Defendants to articulate a legitimate, nondiscriminatory reason for Plaintiff's discharge. The <u>ultimate</u> burden of proof then shifts back to Plaintiff to prove that Defendants' reasons are merely pretext for unlawful discrimination.  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  At all times, Plaintiff has the ultimate burden of proving intentional discrimination for each of his claims. *Id.*

### 3. Plaintiff Cannot Establish A *Prima Facie* Case Of Gender Discrimination.

In Counts III and IV of the Complaint, Plaintiff alleges a "sexual stereotyping" gender discrimination claim based on his allegation that Defendants "knew or should have known that Henry is transgender." (Compl., ¶¶150-164)  To establish a *prima facie* case of gender discrimination, Plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position;[4]  (3) Defendants subjected him to an adverse employment action; and (4) Defendants did not subject similarly situated persons outside the protected class to such adverse action. *McDonnell Douglas Corp.*, 411 U.S. at 802.

First, Plaintiff's *prima facie* case fails because Defendants had no knowledge that he identified as transgender.  Courts repeatedly have held that where the employer had <u>*no actual knowledge*</u> of a protected class status, the plaintiff cannot establish a *prima facie* case of discrimination.  *See*, *e.g., Holden v. Atos Tech. Solution*, Case No. 1:14-cv-914, 2016 U.S. Dist. LEXIS 76560 (S.D. Ohio Apr. 12, 2016) (where plaintiff's membership in a protected group was

---

[4] Defendants deny that Plaintiff was qualified for the Division Secretary position based on the repeated performance deficiencies that were addressed with Plaintiff on more than 12 occasions.  Nonetheless, Defendants recognize that there is a relatively low bar at the *prima facie* stage.  Therefore, for purposes of this Motion, Defendants will address Plaintiff's performance deficiencies with respect to its legitimate, nondiscriminatory reasons for his termination.

not readily apparent based on his Cherokee or Native American nationality, plaintiff must prove that his antagonists actually knew of his protected status to establish a *prima facie* case).

By Plaintiff's own testimony, neither Defendants nor his coworkers had knowledge that Plaintiff identified as transgender.  Throughout his employment, Plaintiff asked to be identified as "Henry." (Pl. Dep. p. 9)  Plaintiff never asked Defendants or coworkers to treat him as female or refer to him by using female pronouns. (*Id.* pp. 9, 11)  Plaintiff does not recall ever informing Ms. Hess that he identified as transgender. (*Id.*, p. 82)  In fact, Plaintiff does not recall disclosing to *anyone* at UH (verbally or in writing) that he identifies as transgender. (*Id.*, p. 83)

Nonetheless, Plaintiff alleges that Defendants "should have known" of his gender identity because, on one occasion, Ms. Hess told Plaintiff to pull his hair back more professionally when he wore it down. (Pl. Dep. pp. 94-95)  Plaintiff also alleges that when he transferred to Seidman, he requested a form to order a female uniform, but he got a male uniform form instead. (*Id.*, p. 90)  Plaintiff's allegations do not establish actual knowledge of Plaintiff's gender identity.  Ms. Hess was not aware that Plaintiff requested a female uniform – and more importantly – he never even wore a uniform at Seidman.  (Hess Decl. ¶18; Pl. Dep. p. 95-96)  Further, the only difference between male and female uniforms is sizing.  By appearance, both uniforms are the same. (Hess Decl. ¶18)  Ms. Hess simply had no knowledge that Plaintiff identified as transgender at any point during Plaintiff's employment. (*Id.,* ¶19)

Plaintiff's *prima facie* case also fails because he cannot establish that he was treated less favorably than any similarly situated cisgender employee.  To be "similarly situated," a comparable employee "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (emphasis added).  Plaintiff has not

identified any cisgender Division Secretary who was treated more favorably *for engaging in the same conduct* as Plaintiff.  No other Seidman Division Secretary incurred 11 unscheduled absences in 12 months <u>and</u> received patient complaints for being rude and ignoring calls for help, without being discharged.  Therefore, Plaintiff's *prima facie* case fails as a matter of law.

### 4.     Plaintiff Cannot Establish A *Prima Facie* Case Of Disability Discrimination.

Counts VII and VIII of the Complaint allege disability discrimination, claiming Plaintiff was discharged because he was disabled due to anxiety and depression,[5] or regarded as disabled. (Compl. ¶¶178-193)  To state a *prima facie* case of disability discrimination under R.C. §4112.02, Plaintiff must establish that: (1) he was disabled or perceived as disabled; (2) he was subjected to an adverse employment action based on his disability or a perception that he was disabled; and (3) he could safely and substantially perform the essential functions of his job. *Roghelia v. Hopedale Mining, LLC*, 2014-Ohio-2934, at *6-7 (7th Dist., June 23, 2014).[6]

First, by his own admission, Plaintiff cannot establish that Defendants regarded him as disabled.  Plaintiff testified that no one perceived him as having anxiety or depression. (Pl. Dep. p. 169)  While Ms. Hess had limited knowledge that Plaintiff had anxiety and depression (*Id.*, pp. 165, 170), merely being aware of an impairment does not show that an employer "regarded" an employee as "disabled."  *Myers,* 2007-Ohio-3228, ¶18; *DeBolt v. Eastman Kodak Co.* (10 Dist.), 2001-Ohio-3996, ¶61.  Plaintiff admitted he was not regarded as disabled.

Plaintiff's *prima facie* case also fails because he cannot establish that he was disabled. *See Kocsis v. Multi-Care Mgmt. Inc.,* 97 F.3d 876, 884 (6th Cir. 1996) (plaintiff must establish

---

[5] Plaintiff's Complaint also alleges that Plaintiff suffered "Car Accident related injuries." (Compl. ¶180)  However, Plaintiff testified that he did not have any medical condition stemming from his car accident. (Pl. Dep. p. 138)

[6] The standards for demonstrating a *prima facie* case under the ADA and Ohio law are "virtually identical."  *House v. Kirtland Capital Partners,* 158 Ohio App.3d 68, 2004-Ohio-3688, ¶23.

he was a qualified individual with a disability at the time of the alleged discriminatory act). "Merely having an impairment does not make one disabled." *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184, 195 (2002). Rather, Plaintiff's alleged impairment must "substantially limit" a major life activity by preventing or severely restricting him from doing activities "that are of central importance to most people's daily lives." *Id.* at 198.

Plaintiff's Complaint alleges that his anxiety and depression substantially limited his ability to work. (Compl., ¶184) However, at his deposition, Plaintiff could not identify anything he was unable to do because of his alleged disability. (Pl. Dep. p. 167) Plaintiff also testified that his alleged disability did not restrict his ability to perform any of his work duties. (*Id.*, pp. 168-69) Plaintiff's Complaint does not allege a failure to accommodate any alleged disability. In fact, since his termination from UH, Plaintiff has held similar secretarial/customer service positions at MRO, Human Arc and Progressive. (Pl. Dep. pp. 173-178)

Plaintiff also cannot establish that he was subjected to an adverse employment action based on his alleged disability. As set forth above, Plaintiff was discharged for (1) incurring an 11th unscheduled absence that had nothing to do with his anxiety or depression; and (2) his egregious treatment of a patient. (Pl. Dep. p. 133, Ex. P) There is simply no evidence that Plaintiff's discharge was based on his alleged disability.

### 5. Plaintiff Cannot Establish That Defendants' Legitimate, Nondiscriminatory Reasons For His Discharge Are A Pretext For Unlawful Discrimination.

Even if Plaintiff could establish a *prima facie* case of discrimination, **merely establishing a *prima facie* case is insufficient to overcome a properly supported motion for summary judgment.** *McDonnell Douglas*, 411 U.S. at 802. *Id.* Plaintiff has the ultimate burden of proving that Defendants' stated legitimate, non-discriminatory reason was merely a pretext for unlawful discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248,

253 (1981).  To establish pretext, Plaintiff must prove that Defendants reasons either: (1) have no basis in fact; (2) did not actually motivate the decision; or (3) were insufficient to warrant the action taken.  *Zambetti v. Cuyahoga Comm. College*, 314 F.3d 249, 258 (6th Cir. 2002).

Plaintiff cannot establish that Defendants' reason for his termination is a pretext for intentional gender or disability discrimination.  First, the Court should **strongly infer** that there was no discriminatory intent because Ms. Hess made the decision to hire Plaintiff less than five months before she decided to discharge him. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 572 (6th Cir. 2003) (*en banc*) (where the same actor makes both positive and adverse employment decisions about the plaintiff within a short time period, a court may strongly infer a nondiscriminatory motivation).  As set forth above, Plaintiff's employment was terminated for the legitimate, non-discriminatory reason that: (1) he incurred an 11th unscheduled absence in violation of UH's Attendance policy after receiving a Final Warning; and (2) Defendants substantiated a patient's complaint that Plaintiff was rude and hung up on him twice when he called for assistance,  failing to help. (Pl. Dep. p. 133, Ex. P)

**Plaintiff cannot establish that Defendants' legitimate, nondiscriminatory reason had no basis in fact.**  Plaintiff does not dispute that he received a prior Counseling, Warning, and Final Warning for excessive absences. (Pl. Dep. pp. 111, 117, 120, Ex. E, H, and J)  Plaintiff also does not dispute his partial absence on February 20, 2019 due to a minor car accident – his 11th unscheduled absence under UH's Attendance policy. (Hess Decl. ¶6, Att. 2)  Further, there is no dispute that a patient complained about Plaintiff failing to provide assistance. (Hess Decl. ¶14, Att. 8)  At his deposition, Plaintiff suddenly claimed to remember the incident and testified that he asked Carlos Stewart to assist the patient. (Pl. Dep. p. 126)  However, Plaintiff admits that he never provided this information to Ms. Hess or anyone else before his termination. (*Id.*, pp. 126-28)  Regardless, the patient credibly reported that Plaintiff was rude and hung up on him twice,

16

and Ms. Hess reasonably believed the incident occurred.  *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998) (holding key inquiry is whether employer "made a reasonably informed and considered decision" before taking the adverse employment action, not whether the decisional process was optimal or "left no stone unturned").

**Plaintiff also cannot establish that Defendants' stated reasons were insufficient to warrant termination or did not actually motivate the termination decision.**  Plaintiff alleges that he was unfairly criticized and targeted for termination because Ms. Hess addressed his performance deficiencies on multiple occasions. (Pl. Dep. 89, 98)  Therefore, Plaintiff "felt like" Ms. Hess did not want him on the unit because he was transgender and/or disabled. (*Id.*, pp. 89-90)  Importantly, not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the employee belongs to a protected class. *See, Beamon v. Marshall & Ilsley Trust Co.,* 411 F.3d 854, 863 (7th Cir. 2005) (holding no evidence of discrimination merely because of plaintiff's perceived unfairness).

Without factual support, bald assertions and conclusory statements are not sufficient to survive summary judgment. *See Hartsel v. Keys*, 87 F.3d 795, 801-02 (6th Cir. 1996), *cert. denied,* 519 U.S. 1055 (1997) (affirming summary judgment; plaintiff's subjective belief that the "tone of the whole situation" indicated gender discrimination and that "it is just one of those things that you feel" was not enough).  Multiple employees raised legitimate concerns about Plaintiff's poor performance, including excessive breaks, leaving the desk unattended, failing to prepare patient information, and failing to provide communication to the nursing staff. (Pl. Dep. pp. 63-68, 75-79, 107, 113, 130-31, Ex. F, O & N)  All complaints were directly related to Plaintiff's job duties – not his gender or alleged disability.  The fact that *numerous* coworkers expressed frustration with Plaintiff because of his poor performance is not evidence of unlawful discrimination.  *Allen*, 697 F.Supp.2d at 854 ("personal conflict does not equate with

discriminatory animus"), *quoting Barnett v. Dept. of Veterans Affairs*, 153 F.3d 338, 342-43 (6th Cir. 1998), *cert. denied*, 525 U.S. 1106 (1999).

Even if Plaintiff could establish that some of his coworkers were biased against him, he cannot establish that Ms. Hess shared that bias.  Ms. Hess was never disrespectful or derogatory toward Plaintiff or demonstrated a gender or disability bias. (Pl. Dep. pp. 94-95, 163-64, 171, 207) When employees repeatedly complained about Plaintiff, Ms. Hess met with Plaintiff *on twelve separate occasions in less than 5 months* in an effort to improve his performance – yet did not terminate his employment for these repetitive performance issues.  (Hess Decl. ¶9, Att. 5)

Further, when two isolated incidents occurred where coworkers may have behaved inappropriately toward Plaintiff, Ms. Hess took prompt remedial action.  On one occasion, Plaintiff alleged that coworker Niesha M. called him a "fag" because she was angry with his poor performance.  (Pl. Dep. p. p. 85)  Ms. Hess investigated but could not substantiate the allegation. (Hess Decl. ¶¶12-13, Att. 7)  Nonetheless, Ms. Hess warned Niesha that the alleged misconduct was a violation of UH policies. (*Id.*)  There were were no further incidents between Plaintiff and Niesha M. (Pl. Dep. p. 87)  On one other occasion, Ms. Hess issued a written warning to STNA Aubrey when she substantiated that Aubrey used profanity and disrespected Plaintiff, telling him to "do his fucking job." (Hess Decl. ¶11, Att. 6)  These two isolated incidents, which were fully investigated and addressed by Ms. Hess, are simply insufficient to establish a pretext for discrimination.  *See Newman v. Fed. Express Corp.,* 266 F.3d 401, 405 (6th Cir. 2001), *quoting, Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (discrimination laws are not meant to be a "general civility code").

Despite repeatedly addressing Plaintiff's poor performance with him, Ms. Hess did not take the adverse employment action until she substantiated Plaintiff's egregious behavior toward

the cancer patient on February 19, 2019 and 11th unscheduled absence. (Hess Decl. ¶16)  There is simply no evidence of a pretext for discrimination.

### D.    Plaintiff's Retaliation Claims (Counts V and VI)

Counts V and VI of the Complaint allege that Defendants unlawfully retaliated against Plaintiff in violation of R.C. Chapter 4112 and Title VII because of his complaints alleging discrimination. (Compl., ¶¶165-177)  Similar to his discrimination claims, Plaintiff cannot establish a *prima facie* case of retaliation or prove that Defendants' legitimate, non-retaliatory reasons for his termination were a pretext for unlawful retaliation.[7]

### 1.    Plaintiff Cannot Establish A *Prima Facie* Case Of Retaliation.

To establish a *prima facie* case of retaliation, Plaintiff must prove that: (1) he engaged in a protected activity; (2) Defendants knew of the protected activity; (3) he suffered an adverse action subsequent to or contemporaneous with the protected activity; and (4) there is a causal connection between the protected activity and the adverse action.  *Barrow v. City of Cleveland*, 773 Fed.Appx. 254, 261 (6th Cir. 2019).  Plaintiff's *prima facie* case fails because he cannot establish a causal connection between his complaints to UH and his discharge.

To establish a "causal connection," Plaintiff must prove "but-for" causation, meaning "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Barrow*, 773 Fed.Appx. at 261, *quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  Even if Plaintiff can establish a closeness in time between his protected activity and his discharge, ***in the absence of other compelling evidence***, temporal proximity alone does not support a claim of retaliation.  *Thaman v. OhioHealthCorp.*, 2005 U.S. LEXIS 12872 (S.D. Ohio, June 29, 2005).

---

[7] Similar to her discrimination claims, Plaintiff's state and federal retaliation claims must be determined using the same *McDonnell Douglas* burden-shifting model. *Sizemore v. Edgewood Bd. of Educ.*, Case No. 1:19-cv-555, 2020 U.S. Dist. LEXIS 67765 (S.D. Ohio Apr. 17, 2020).  Therefore, Counts V and VI are addressed simultaneously.

Other than the temporal proximity, Plaintiff has no evidence that his discharge would not have occurred but for his discrimination complaints.  As set forth in detail above, Defendants received a serious complaint regarding Plaintiff's egregious behavior toward a patient who needed assistance on February 19, 2019.  The next day, Plaintiff incurred an 11th unscheduled absence, in violation of the Attendance policy.  Neither of these incidents had anything to do with Plaintiff's allegations of discrimination or unfair treatment, and clearly warranted discharge.  *See, Sami v. Detroit Med. Ctr.*, 591 Fed.Appx. 419 (6th Cir. 2014) (affirming summary judgment; plaintiff's numerous unsafe surgical procedures warranted his termination, regardless of any alleged discriminatory animus).

Further evidence of a non-retaliatory motive by Ms. Hess is that the discharge was independently reviewed by Operations VP Linda Mangosh and the PRC. (Pl. Dep. p. 147, Ex. S and T)  Each conducted separate investigations, giving Plaintiff the opportunity to present additional evidence. (*Id.*)  After reviewing all of the facts, both Ms. Mangosh and the PRC determined that Plaintiff's discharge was justified. (*Id.*)  Therefore, these independent investigations effectively broke any possible causal chain between an alleged retaliatory animus by Ms. Hess and Plaintiff's discharge.  *See, Sami*, 591 Fed.Appx. at 426.

> **2.  Defendants Have Legitimate, Non-Retaliatory Reasons For Plaintiff's Termination Which Are Not A Pretext For Retaliation.**

For the same reasons set forth in Section III.C.5 above (incorporated herein), Plaintiff is unable to establish that Defendants' legitimate, non-retaliatory reasons for his discharge are a pretext for unlawful retaliation.  Therefore, Plaintiff's retaliation claim fails.

## V.  CONCLUSION

For all of the foregoing reasons, Defendants request summary judgment as a matter of law as to all of Plaintiff's claims.

Respectfully submitted,

_____/s/  Thomas R. Crookes_____

Thomas R. Crookes  (0038969)
Ashley M. Manfull  (0071372)
**VORYS, SATER, SEYMOUR AND PEASE LLP**
106 S. Main Street, Suite 1100
Akron, OH  44308
(330) 208-1000
(330) 208-1001 *facsimile*

*Counsel for Defendants*